UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LEWIS S. STRODA,

    Plaintiff,

  v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

CASE NO. C09-5112BHS-KLS

REPORT AND RECOMMENDATION

Noted for January 1, 2010

Plaintiff, Lewis S. Stroda, has brought this matter for judicial review of the determination that he was no longer disabled, and therefore no longer entitled to supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 23 years old.[1] Tr. 28. He has an eighth grade education and no past relevant work experience. Tr. 25, 436.

On December 9, 1998, an application for SSI benefits was protectively filed on behalf of plaintiff,

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

who was then a child under the age of 18, alleging disability as of November 13, 1986. Tr. 42-45, 306. His application was denied initially and on reconsideration. Tr. 28-29, 31, 306. On April 6, 2001, plaintiff was found to be disabled by an administrative law judge ("ALJ"). See Tr. 306-12. Specifically, the ALJ found plaintiff's "borderline intellectual functioning, in combination with his language disorder," met the criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.05D. Tr. 311-12.

Plaintiff attained the age of 18 on November 13, 2004. Tr. 20. Accordingly, on February 28, 2005, pursuant to "the rules for determining disability in adults when" a claimant attains the age of 18, plaintiff's eligibility for SSI benefits was re-determined, and he was found no longer to be disabled as of February 1, 2005. Tr. 18, 313, 316. This re-determination was upheld on reconsideration following a disability hearing conducted by a state agency hearing officer. Tr. 18, 314, 327-35. Pursuant to plaintiff's request therefor, a another hearing was held before an ALJ on November 15, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a lay witness and a vocational expert. Tr. 659-92.

On February 8, 2008, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1) at step two of the sequential disability evaluation process,[2] plaintiff had a "severe" impairment consisting of mild mental retardation;

(2) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(3) after step three but before step four, plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, but was limited to simple and routine work and only brief and structured public interaction;

(4) at step four, plaintiff had no past relevant work; and

(5) at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 18-27. Plaintiff's request for review was denied by the Appeals Council on January 8, 2009, making

---

[2]For adult claimants – i.e., claimants who have attained the age of 18 – the Commissioner employs a five-step "sequential evaluation process" to determine whether the claimant is disabled, and thus whether his or her application for disability benefits should be granted. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id. For a claimant who is eligible for SSI benefits as a child under the age of 18, the required "redetermination of disability" is made "under the rules for adults who file new applications." Tr. 20. At step one of the disability evaluation process, the ALJ determines whether the claimant has engaged in substantial gainful activity since his or her alleged onset date of disability. See 20 C.F.R. § 416.920(a)(4)(i). The ALJ made no specific determination at this step, likely because, as noted above, plaintiff has no past work experience. In any event, no issue has been raised with regard to whether or not plaintiff has engaged in substantial gainful activity, and, therefore, none is before the Court for its consideration.

REPORT AND RECOMMENDATION
Page - 2

1  the ALJ's decision the Commissioner's final decision. Tr. 8; 20 C.F.R. § 416.1481.

2  On March 2, 2009, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1). The administrative record was filed with the Court on May 6, 2009. (Dkt. #8). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits for the following reasons:

> (a) the ALJ erred in finding plaintiff's mental impairment did not meet the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C;
>
> (b) the ALJ erred in assessing plaintiff's credibility;
>
> (c) the ALJ erred in evaluating the lay witness evidence in the record; and
>
> (d) the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

For the reasons set forth below, the undersigned does not agree that the ALJ erred in determining plaintiff to be not disabled, and therefore recommends that the ALJ's decision be affirmed.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.  The ALJ's Step Three Determination

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or medically equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the claimant's impairments meet or medically equal a listed impairment, he or she is deemed disabled. Id. The burden of proof is on the claimant to establish that his or her impairments meet or medically equal any impairments in the Listings. Tacket, 180 F.3d at 1098. However, "[a] generalized

assertion of functional problems is not enough to establish disability at step three." Id. at 1100 (citing 20 C.F.R. § 404.1526).

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908. It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.; see also SSR 96-8p, 1996 WL 374184 *2 (determination that is conducted at step three must be made on basis of medical factors alone). An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

An impairment, or combination of impairments, equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id.; see also Sullivan v. Zebley, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.") (emphasis in original). However, "symptoms alone" will not justify a finding of equivalence. Id. The ALJ also "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." Burch v. Barnhart, 400 F.3d 676 (9th Cir. 2005).

The ALJ need not "state why a claimant failed to satisfy every different section of the listing of impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (finding ALJ did not err in failing to state what evidence supported conclusion that, or discuss why, claimant's impairments did not meet or exceed Listings). This is particularly true where, as noted above, the claimant has failed to set forth any reasons as to why the Listing criteria have been met or equaled. Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) (finding ALJ's failure to discuss combined effect of claimant's impairments was not error, noting claimant offered no theory as to how, or point to any evidence to show, his impairments combined to equal a listed impairment).

In this case, the ALJ found plaintiff's mental impairment did not meet or medically equal Listing

12.05, including Listing 12.05C, which reads in relevant part:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . .

See Tr. 20-22. Specifically in regard to Listing 12.05C, the ALJ found:

> . . . In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70, *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function. As an adult, his I.Q. scores . . . in January 2005 were reported, as follows: verbal I.Q. score of 67; performance I.Q. of 78; and full scale I.Q. of 70 (Exhibit 12F/5). Whereas these include a verbal score of 67 and a full scale score of 70, the claimant does not have a physical or mental impairment imposing additional and significant work-related limitation in functioning.

Tr. 21 (emphasis in original). Plaintiff argues the ALJ erred in so finding, noting the medical evidence in the record shows he has been diagnosed with depression and consistently has been assessed with a global assessment of functioning ("GAF") score of 50. See, e.g., Tr. 555, 557, 559, 561, 565, 569, 571, 587. The undersigned, however, finds such evidence fails to establish listing level severity here.

To meet the first criteria of Listing 12.05(C), the claimant's IQ score must be "valid." Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). The medical and other evidence in the record can "cast doubt on the validity" of that score. Id. However, as just noted, the ALJ found, and the parties do not dispute that plaintiff has valid verbal and full scare I.Q. scores falling within the required range. The first criteria of Listing 12.05C, therefore, has been met. There also is no dispute that plaintiff has met the requirement that he have had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" prior to age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C); See Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (claimant must demonstrate his or her impairment satisfies diagnostic description for Listing 12.05 contained in explanatory material for mental disorders under Listing 12.00) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)).

In regard to the second criteria, the ALJ assesses "the degree of functional limitation" the alleged additional impairment imposes, to determine if it "significantly limits" the claimant's "physical or mental

1 ability to do basic work activities," i.e., if the impairment is "severe" as defined in 20 C.F.R. § 416.920(c). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). A GAF score of 50 does indicate "'[s]erious symptoms" or "serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); see also England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of daily life).

It also is true as plaintiff points out, that he has been assessed with a GAF score of 50 by more than one medical opinion source in the record. See Tr. 296, 511, 557, 559, 571, 587. Seen in context, however, none of these GAF scores actually satisfy the specific criteria of Listing 12.05C. For example, one of those scores was assessed by David deVidal, Ph.D., who – based on a psychological evaluation he conducted in late November 2000 – diagnosed plaintiff with an attention-deficit/hyperactivity disorder ("ADHD"), predominantly inattentive type, and borderline intellectual functioning. Tr. 296. But as noted by the ALJ, James R. Adams, Ph.D., who also conducted a psychological evaluation of plaintiff in late January 2005, concluded that plaintiff's "mental status examination and testing did not reveal the presence of ADHD." Tr. 24, 511.

The ALJ thus did not err in finding plaintiff's ADHD to be a non-severe impairment." See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (where opinion of examining physician is based on independent clinical findings, it is within ALJ's discretion to disregard conflicting opinion in another examining physician's diagnosis); see also 20 C.F.R. § 416.920(a)(4)(iii), (c) (impairment is not severe if it does not significantly limit claimant's mental or physical abilities to do basic work activities); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Accordingly, the ALJ was not required to adopt Dr. deVidal's assessed GAF score of 50, to the extent that it was based on his diagnosis of ADHD. As for Dr. Adams, he too assessed plaintiff with a GAF score of 50, but his only diagnosis was one of mild mental retardation. See Tr. 511. This particular GAF score, therefore, also does not support a finding of listing-level severity at step three.

As for the other assessed GAF scores of 50, two were based on a diagnosis of a moderate, chronic major depressive disorder, single episode (Tr. 557, 571), and two were based on that diagnosis, along with

a diagnosis of predominantly inattentive type ADHD (Tr. 559, 587). As just discussed, the ALJ properly disregarded Dr. deVidal's assessed GAF score based on the contrary findings of Dr. Adams. It is true that the above two GAF scores that were based in part on a diagnosis of ADHD were assessed after Dr. Adams issued his evaluation report. However, those scores were assessed by mental health counselors rather than by "acceptable medical sources" – as were the two GAF scores based solely on the diagnosis of depression – and, as such, the ALJ could give them less weight. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996); see also 20 C.F.R. § 416.913(a), (d) (licensed physicians and licensed or certified psychologists are "acceptable medical sources").

To the extent these four GAF scores were based wholly or partly on the diagnosis of depression, the ALJ again properly found that while "[d]epression and anger" had "been mentioned" in the record, the medical evidence contained therein revealed "few if any" actual consequences stemming therefrom. Tr. 24. Indeed, the forms on which the mental health counselors assessed their GAF scores failed to specify any work-related activities supposedly significantly impacted by plaintiff's diagnosed mental impairments. See Tr. 555-59, 569-72, 582-88. As noted by the ALJ, furthermore, plaintiff himself reported in early May 2006 – several months after the last GAF score of 50 was assessed – that his "depressive symptoms" were "improved" and "better", and that his "anger outbursts were not nearly as often or as severe," and in late August 2006, his anger again "appeared to be under control." Tr. 25, 535, 649. The record thus fails to support a finding of disability under Listing 12.05C.

II.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

REPORT AND RECOMMENDATION
Page - 7

Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ in this case discounted plaintiff's credibility because the "[o]bjective medical evidence and other factors" did not "fully support" his "statements concerning the intensity, persistence and limiting effects of" his alleged symptoms. Tr. 23. Specifically, the ALJ found in relevant part:

> . . . He was in Special Education, but ultimately was held back in 7th grade because of excessive absences for illness (Exhibits 3F; 12F/2; B-16F/10; and 25E/3 and 6). At that time, he was seen irregularly with complaints including abdominal pain; headaches; right knee pain after falling from his bike; and asthma, but his symptoms were treatable, and findings did not reveal he had a severe physical impairment (Exhibits 4F, 5F, 6F, 7F, 8F, 9F). On the other hand, he has also said he stayed home because he was picked-on at school (15F/49). This is inconsistent with the statements about absences as a result of illness. He told Dr. Adams that he dropped out in ninth grade (Exhibit 12F/2). He has said he would like to complete his GED, but there is no evidence he has pursued it (Exhibit 15F).

Id. These are valid reasons for discounting a claimant's credibility. See Smolen, 80 F.3d at 1284 (ALJ may consider prior inconsistent statements concerning symptoms); Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis of medical improvement); Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998) (determination that claimant's complaints are inconsistent with objective medical evidence can satisfy clear and convincing requirement); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998) (ALJ may consider motivation and issue of secondary gain in rejecting symptom testimony); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) (same).

The ALJ also pointed out the concern of one treating medical source in the record, Shawn Aaron, M.D., regarding "serious augmentation of [plaintiff's] examination and pain medication seeking behavior," which the ALJ properly noted did not help plaintiff's credibility. Tr. 24, 644. The undersigned agrees that

this too is a valid reason for discounting a claimant's credibility, as it indicates a tendency for malingering, as well as drug-seeking behavior, on plaintiff's part. See Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) (ALJ properly considered claimant's drug-seeking behavior). In addition, other medical sources in the record found plaintiff to be less than fully credible as well. See Tr. 143, 148.

As discussed above, the ALJ further found no evidence in the record of plaintiff's alleged ADHD and depression being a severe impairment, which again is a valid basis for discounting his credibility. Tr. 24; see Regennitter, 166 F.3d at 1297. The ALJ next discounted plaintiff's credibility in part because of evidence in the record that he cleaned, played games, cooked, did household chores, biked, walked five miles, went to friends' houses, used a computer to access the internet for downloading music and playing role-playing games that required involved, focused efforts on his part, and drove. Tr. 24. To determine whether plaintiff's symptom testimony is credible, the ALJ may consider his daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if plaintiff "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. Plaintiff need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues the ALJ failed to find the activities he described consumed a substantial part of the day or were easily transferable to a work setting. It is true that the ALJ did not specifically state this to be the case in his decision, but the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989). That is, the Court can presume that in listing plaintiff's activities as a basis for discounting plaintiff's credibility, the ALJ found plaintiff was able to spend a substantial part of the day performing them and/or they were transferable to a work setting. The evidence in the record overall, furthermore, largely supports that presumption here. See Tr. 440-44, 449-54, 457, 460-62. For example, plaintiff's aunt noted that he babysat his friends' two boys when they were at work, that he cleaned his house, and that he played "TV" games "all day long." Tr. 441-42, 444.

Plaintiff's cousin also reported that plaintiff's daily activities included cleaning his house, as well as playing video games "off and on all day." Tr. 457, 461. In describing what he did from the time he wakes up until the time he goes to bed, plaintiff himself wrote in a daily activities questionaire that he played games and cleaned his house. Tr. 449. He also reported on that questionaire that he took care of

1 "some kids" that lived in his house, babysat "sometimes," and performed household chores "every day,"

2 albeit for an hour each day. Tr. 450-51. While the testimony plaintiff gave at the hearing may not support

3 the extent to which the above reports indicate he engaged in these activities (see Tr. 670-75), it is the

4 ALJ's responsibility to resolve any conflicts or ambiguities in the evidence. See Reddick v. Chater, 157

5 F.3d 715, 722 (9th Cir. 1998); Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982); Morgan v.

6 Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999); see also Allen,

7 749 F.2d at 579 (court may not reverse ALJ's credibility determination where that determination is based

8 on contradictory or ambiguous evidence).

9 Even if the ALJ did err to some extent in discounting plaintiff's credibility in part on his activities

10 of daily living, as noted herein he gave several other valid reasons for doing so. Thus, the fact that some

11 of the reasons for discounting plaintiff's credibility may have been improper, does not render the ALJ's

12 credibility determination invalid, as long as that determination is supported by substantial evidence in the

13 record, as it is in this case. Tonapetyan, 242 F.3d at 1148. Indeed, other such reasons include the fact that,

14 as the ALJ pointed out, there are "[a] number of 'no shows'" in regard to mental health counseling

15 sessions in the record, which further adversely impacts plaintiff's credibility. Tr. 25; see Fair v. Bowen,

16 885 F.2d 597, 603 (9th Cir. 1989) (failure to assert good reason for not seeking, or following prescribed

17 course of, treatment can cast doubt on claimant's sincerity).

18 Lastly, the ALJ noted, and the record shows, plaintiff's depression and anger had improved and/or

19 were under control, which, once more, is an entirely legitimate basis upon which to discount a claimant's

20 credibility. Tr. 25; see Morgan, 169 F.3d at 599; Tidwell, 161 F.3d at 601. Plaintiff asserts the ALJ did not

21 state what specific symptom testimony he found to be not credible and what specific evidence in the record

22 showed this lack of credibility. As discussed above, however, such is clearly not the case, as the ALJ

23 provided a detailed explanation as to why he found plaintiff to be not fully credible. Accordingly, for all

24 of the above reasons, the undersigned finds the ALJ did not err in doing so.

25 III. The ALJ's Evaluation of the Lay Witness Evidence in the Record

26 Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into

27 account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to

28 each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony,

the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

The record contains written statements from several lay witnesses (see Tr. 440-48, 457-65, 503-05). With respect to those statements, the ALJ found as follows:

> . . . The . . . third-parties' statements describe his inaction, lack of planning, short attention span, etc. They generally identified memory, understanding, following instructions, concentration, completing tasks, and getting along with others as items that the claimant's condition affect. However, they also indicate he cleans; plays games; cooks; does chores in house; bikes and walks five miles; and goes to friends' houses . . .

Tr. 24. Plaintiff argues these are not germane reasons for rejecting the statements of those lay witnesses. The undersigned disagrees. As discussed above in regard to the ALJ's assessment of plaintiff's credibility, the evidence in the record overall shows an ability on the part of plaintiff to engage in activities of daily living at a level above which he has testified and alleges he can. In addition, also as discussed above, while some of that evidence may be ambiguous, it is the sole duty of the ALJ to resolve those ambiguities, which the ALJ properly did in this case. So too does the ALJ's proper analysis of the evidence in the record overall also apply to the above lay witness statements, and thus to the extent it contradicts their statements concerning plaintiff's functioning, constitutes a germane reason for rejecting them. The undersigned finds, therefore, no error on the part of the ALJ here as well.

IV.  The ALJ's Step Five Analysis

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only

REPORT AND RECOMMENDATION
Page - 11

1 those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a
2 claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional
3 limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other
4 evidence." Id. at *7.

In this case, the ALJ assessed plaintiff with the residual functional capacity to perform "a full range of light work at all exertional levels but with the following nonexertional limitations: simple and routine work" and "only brief and structured public interaction." Tr. 22. Plaintiff argues the ALJ did not include all of the limitations the lay witnesses in the record reported that he had. But because the ALJ did not err in rejecting those limitations for the reasons discussed above, he was not obligated to either adopt them or include them in his assessment of plaintiff's residual functional capacity.

As noted above, the ALJ found plaintiff had no past relevant work at step four of the sequential disability evaluation process. See Tr. 25. If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett, 180 F.3d at 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the hearing, the ALJ posed a hypothetical question to the vocational expert, which asked the vocational expert to consider an individual with substantially the same limitations as the ALJ included in his assessment of plaintiff's residual functional capacity. Tr. 690. In response to that hypothetical

question, the vocational expert testified that such an individual, with the same age, education and work experience as plaintiff, would be able to perform the following jobs: industrial cleaner (Dictionary of Occupational Titles ("DOT") 381.687-018) and warehouse worker (DOT 922.687-058). Id. Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other work existing in significant numbers in the national economy, and thus not disabled at step five. Tr. 25-26.

Plaintiff notes that in response to an additional hypothetical question the ALJ posed at the hearing, the vocational expert testified that an individual who is unable to focus, concentrate and remain productive during the course of his or her time at work – and which would result in an ability to produce at best at 60 percent of what would normally be expected – would not be able to maintain competitive employment. Tr. 690-91. Plaintiff, however, points to nothing in the record which would support such a conclusion, and which the ALJ would be required to adopt, especially given the ALJ's proper evaluation of the medical and lay witness evidence in the record, as well as his determination regarding plaintiff's credibility and residual functional capacity, both of which were proper as well.

Plaintiff further argues that because both jobs the vocational expert testified that he could perform require – according to the definitions thereof contained in the DOT – more than the limitation to simple and routine work assessed by the ALJ, and because neither the ALJ nor the vocational expert provided a valid explanation for this discrepancy, the ALJ's determination that plaintiff could perform those jobs was not supported by substantial evidence. The ALJ may rely on vocational expert testimony that "contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation." Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995). As such, the ALJ has the affirmative responsibility to ask the vocational expert about possible conflicts between his or her testimony and the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704.

Before relying on evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ must "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1. The ALJ also must explain in his or her decision how the discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4. This, however, requires that there first be an actual discrepancy between the vocational expert's testimony and the DOT. Plaintiff argues the vocational expert's testimony conflicts with the requirement set forth in the DOT that both jobs identified

REPORT AND RECOMMENDATION
Page - 13

above involve Level 2 reasoning, which is defined as follows:

> LEVEL 2
>
> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

DOT 381.687-018; DOT 922.687-058; DOT Appendix C. On the other hand, the limitation to simple and routine work, plaintiff asserts, is Level 1 reasoning, which the DOT defines as:

> LEVEL 1
>
> Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

DOT Appendix C.

The undersigned agrees with defendant, however, that there is no conflict between the vocational expert's testimony and the DOT here, albeit not for the same reason. Defendant argues that because both of the jobs identified by the vocational expert as ones plaintiff can do are defined by the DOT as having a Specific Vocational Preparation ("SVP") of 2, which corresponds to unskilled work, and Social Security regulations define unskilled work as being simple work requiring little or no judgment, there is no conflict, as this is the type of work to which the ALJ limited plaintiff. This argument, though, is at odds with other courts who have considered the issue. While the Ninth Circuit has not decided this issue, at least one other district court in this circuit has done so, resolving it as follows:

> Key to the present case is the ALJ's finding that [the claimant's] ailments limited her to work involving simple tasks performed at a routine or repetitive pace. [The claimant] asserts that such a restriction is inconsistent with her ability to perform any of the other work as the descriptions of those jobs in the . . . DOT require a higher reasoning capacity than that allowed by the ALJ's RFC.
>
> [The claimant] argues that the rub comes from the fact that the other work, which the ALJ pointed to as something which she could perform and, hence, the reason for denying her benefits, requires a level of reasoning beyond that contemplated as "simple, repetitive."
>
> The DOT describes the . . . job as requiring a reasoning level of two out of a six-point scale. A level two reasoning indicates that the job requires the person to be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and "[d]eal with problems involving a few concrete variables in or from standardized situations." . . . This leaves the question of whether such a reasoning level is consonant with a limitation to simple, repetitive mental tasks.

> The Commissioner argues that it does, but does so by pointing to a separate vocational consideration listed in the DOT-a job's . . . SVP . . . score. The . . . job is considered an unskilled one under the DOT's SVP scores. The Commissioner contends that because the job had an SVP level of two, which essentially is unskilled work, the vocational expert's opinion does not conflict with the DOT. . . . Unskilled work is defined under Social Security regulations as requiring little or no judgment to do simple duties that can be learned on the job in a short period of time. *See* 20 C.F.R. § 416.968(a). Because the job duties for [the claimant's] work . . . would be simple ones, the Commissioner posits that the reasoning required to perform those jobs must necessarily be simple as well and, hence, not in conflict with the ALJ's "simple, repetitive" functional restriction.
>
> The problem for the Commissioner is that she is conflating two separate vocational considerations. Other courts decided that, contrary to the Commissioner's argument here, the SVP level in a DOT listing indicating unskilled work, does not address whether a job entails only simple, repetitive tasks. *See, e.g., Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir.1997); *Cooper v. Barnhart*, 2004 WL 2381515, at *4 (N.D.Okla. Oct.15, 2004); *Hall v. Barnhart*, 2004 WL 1896969, at *3 (D.Me. Aug.25, 2004). A job's SVP is focused on "the amount of lapsed time" it takes for a typical worker to learn the job's duties. . . . A job's reasoning level, by contrast, gauges the minimal ability a worker needs to complete the job's tasks themselves. As one court noted, "SVP ratings speak to the issue of the level of vocational preparation necessary to perform the job, not directly to the issue of a job's simplicity, which appears to be more squarely addressed by the . . . [reasoning level] ratings." *Hall-Grover v. Barnhart*, 2004 WL 1529283, at *4 (D.Me. April 30, 2004). Here, the one vocational consideration directly on point with the limitation contained in the RFC is a job's reasoning level score.

Meissel v. Barnhart, 403 F.Supp.2d 981, 982-83 (9th Cir. 2005) (footnote and internal citations omitted).

The undersigned finds the reasoning of the above district court's opinion, and that of the other courts cited and quoted therein, persuasive, and hereby adopts it. See, e.g., Cooper, 2004 WL 2381515 at *4 ("The explanations of SVP in the DOT suggest that the SVP specifies the vocational preparation required to perform a job. The reasoning level . . . appears more similar to whether or not a claimant has a limitation to performing only simple tasks."). Indeed, this appears to be the approach taken by other circuit courts as well. The Eighth Circuit, for example, has noted that:

> The Social Security's own list of unskilled sedentary jobs . . . indicates that many jobs within this range require more than the mental capacity to follow simple instructions. For each job described, the *Dictionary of Occupational Titles* specifies the type of reasoning capabilities the job requires. . . . For instance, a job rated reasoning level one requires the ability to understand and carry out simple instructions, whereas a job rated reasoning level two requires the ability to understand and carry out detailed instructions. . . . Many of the jobs listed require level two reasoning or higher in the unskilled sedentary job category.

Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) (internal citations omitted).

The undersigned disagrees with plaintiff, however, that the ALJ's limitation to simple and routine work is commensurate with Level 1 reasoning in this case. As defendant points out, several courts have found Level 2 reasoning to be consistent with the ability to do simple, routine and/or repetitive work tasks. See, e.g., Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (Level 2 reasoning more consistent with limitation to simple, routine work tasks); Meissl v. Barnhart, 403 F.Supp.2d 981, 983-85 (C.D. Cal. 2005) (limitation to simple, repetitive tasks closer to Level 2 reasoning); Flaherty v. Halter, 182 F.Supp.2d 824, 850-51 (D. Minn. 2001) (Level 2 reasoning did not conflict with limitation to work involving simple, routine, repetitive, concrete, and tangible tasks).

It is true that at least one court appears to disagree with the position taken by the above courts. See Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) (rejecting contention that claimant limited to following only simple instructions can engage in full range of sedentary work, as many unskilled jobs in that category require reasoning levels of 2 or higher). However, the undersigned finds more persuasive the discussion of this issue again made by the district court in Meissl:

> This leaves the question of whether the vocational expert's opinion contradicted the DOT's descriptions for [the claimant's] other work . . . given the ALJ's RFC finding limiting [the claimant] to "simple, repetitive" tasks. The Court finds that it does not.
>
> As one goes up the numerical reasoning development scale used by the DOT, the level of detail involved in performing the job increases while the job task becomes less routine. For example, a job with a reasoning level of one only requires that the worker be able to "[a]pply commonsense understanding to carry out simple one-or two-step instructions" in "standardized situations with occasional or no variables." . . . In contrast, a job with a reasoning level of three would require that the worker "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and deal "with problems involving several concrete variables . . . ." . . . The middle ground between these two points is also where the vocational expert identified a job with the lowest reasoning development score that [the claimant] could perform . . .
>
> A job with a reasoning level of two requires that the worker "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and deal with problems "involving a few concrete variables . . . ." . . . Thus, such a job would involve more detail, as well as a few more variables, than that with a reasoning level of one. The question becomes whether a person limited to carrying out simple, repetitive instructions could still perform a job with such a reasoning score.
>
> [The claimant] focuses on the fact that the DOT description for a reasoning level of 2 uses the word "detailed." Essentially, [the claimant] seeks to equate the DOT's use of the word "detailed" with the Social Security regulations' use of the word "detailed instructions" in formulating a claimant's mental RFC. The Court is not convinced that such a neat, one-to-one parallel exists between the two.
>
> The Social Security regulations separate a claimant's ability to understand and

remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). . . . To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Even more problematic for [the claimant's] position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

Here, the ALJ found that [the claimant] could perform not just simple tasks but also ones that had some element of repetitiveness to them. A reasoning level of one on the DOT scale requires slightly less than this level of reasoning. While reasoning level two notes the worker must be able to follow "detailed" instructions, it also (as previously noted) downplayed the rigorousness of those instructions by labeling them as being "uninvolved."

The Court finds that there is much to recommend for believing that [the claimant's] reasoning level is at level two rather than at level one. A reasoning level of one indicates, both by the fact that it is the lowest rung on the development scale as well as the fairly limited reasoning required to do the job, as applying to the most elementary of occupations; only the slightest bit of rote reasoning being required. For example, the DOT describes the following jobs as requiring only a reasoning level of one: Counting cows as they come off a truck (job title Checker (motor trans.)); pasting labels on filled whiskey bottles (job title Bottling-Line Attendant (beverage)); and tapping the lid of cans with a stick (job title Vacuum Tester, Cans). . . . Someone able to perform simple, repetitive instructions indicates a level of reasoning sophistication above those listed. Other courts have so held. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir.2005) (holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart*, 91 Fed.Appx. 210, 214, 2004 WL 362291, at *3 (3rd Cir.2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"). As one court explained:

> The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved-that is, not a high level of reasoning.

*Flaherty v. Halter*, 182 F.Supp.2d 824, 850 (D.Minn.2001).

Meissl, 403 F.Supp.2d at 983-85 (internal citations omitted).

This case is somewhat different than the situation facing the district court in Meissl. As discussed by the district court above, in Meissl the ALJ limited the claimant to simple and repetitive tasks, whereas the ALJ in this case limited plaintiff to simple and routine work. At first glance, the ALJ's limitations here would appear to be more consistent with Level 1 reasoning, and its emphasis on "simple" instructions. As the Meissl court noted, however, Level 1 reasoning is "the lowest rung on the development scale," which involves "fairly limited reasoning required to do the job," and is to be applied to "the most elementary of occupations," with "only the slightest bit of rote reasoning being required." Id. at 984. The district court in Meissl, furthermore, noted that the Tenth Circuit had found simple and routine work to be more consistent with a DOT reasoning Level of 2. The undersigned so finds here as well.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was not disabled, and should affirm the ALJ's decision.

Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **January 1, 2010**, as noted in the caption.

DATED this 4th day of December, 2009.

Karen L. Strombom
United States Magistrate Judge